UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| HEATHER R.,<br><br>                    Plaintiff,<br><br>          vs.<br><br>ANDREW M. SAUL, Commissioner of<br>the Social Security Administration,<br><br>                    Defendant. | 4:20-CV-04082-VLD<br><br><br>MEMORANDUM OPINION<br>AND ORDER |

**INTRODUCTION**

Plaintiff, Heather R., seeks judicial review of the Commissioner's final

decision denying her application for social security disability and supplemental

security income disability benefits under Title II and Title XVI of the Social

Security Act.[1]

Ms. R. has filed a complaint and motion to reverse the Commissioner's

final decision denying her disability benefits and to remand the matter to the

---

[1]SSI benefits are called "Title XVI" benefits, and SSD/DIB benefits are called
"Title II" benefits.  Receipt of both forms of benefits is dependent upon whether
the claimant is disabled.   The definition of disability is the same under both
Titles.  The difference—greatly simplified—is that a claimant's entitlement to
SSD/DIB benefits is dependent upon one's "coverage" status (calculated
according to one's earning history), and the amount of benefits are likewise
calculated according to a formula using the claimant's earning history.  There
are no such "coverage" requirements for SSI benefits, but the potential amount
of SSI benefits is uniform and set by statute, dependent upon the claimant's
financial situation, and reduced by the claimant's earnings, if any.  There are
corresponding and usually identical regulations for each type of benefit.  See,
e.g., 20 C.F.R. §§ 404.1520 and 416.920 (evaluation of disability using the five-
step procedure under Title II and Title XVI).  Ms. R. filed her application for
both types of benefits.  T10.  Her coverage status for SSD benefits expires on
March 31, 2022.  T13.  In other words, in order to be entitled to Title II
benefits, Ms. R. must prove disability on or before that date.

Social Security Administration for further proceedings. <u>See</u> Docket Nos. 1, 30. The Commissioner has filed his own motion seeking affirmance of the decision at the agency level. <u>See</u> Docket No. 32.

This appeal of the Commissioner's final decision denying benefits is properly before the court pursuant to 42 U.S.C. § 405(g). This matter is before this magistrate judge for determination pursuant to the consent of the parties. <u>See</u> 28 U.S.C. § 636(c).

<strong>FACTS</strong>[2]

### A.    Statement of the Case

This action arises from Heather R.'s application for Social Security Disability Benefits (SSDI) and Supplemental Security Income (SSI) with a protected filing date of December 12, 2016, alleging disability starting October 13, 2016, due to depression, headaches/migraines, fibromyalgia, rheumatoid arthritis, anxiety disorder, and interstitial cystitis, and Ms. R. reported she was 5'1" tall and weighed 176 pounds. T74, 263, 319.

Ms. R.'s claims were denied at the initial and reconsideration levels, and Ms. R. requested an administrative hearing. T138, 145, 159.

Ms. R.'s administrative law judge hearing was held on March 28, 2019, where different counsel than her attorney in this appeal represented Ms. R. T43. An unfavorable decision was issued May 1, 2019 by the ALJ. T7.

---

[2] These facts are recited from the parties' stipulated statement of facts (Docket No. 29). The court has made only minor grammatical and stylistic changes. Citations to the appeal record will be cited by "T" followed by the page or pages.

At Step One of the evaluation the ALJ found that Ms. R. had not engaged in substantial gainful activity since October 13, 2016, the alleged onset of disability date.  T13.

At Step Two, the ALJ found that Ms. R. had severe impairments, including a fibromyalgia, migraines, affective disorder, and anxiety disorder. T13.  The ALJ found that each of those impairments significantly limited Ms. R.'s ability to perform basic work activities.  T13.

The ALJ also found that Ms. R. had a medically determinable impairment of mild cervical degenerative changes shown by MRI, but found it caused no more than minimal impact on Ms. R.'s ability to carry out work-related activities, and therefore concluded it was non-severe.  T13.

In Step Three, the ALJ found that Ms. R. did not have an impairment that meets or medically equals a listing.  T15-16.  The ALJ stated he specifically considered Listing 14.09D, but concluded that the record did not satisfy the criteria of the Listing because the record did not document recurrent flares of inflammatory arthritis involving two or more constitutional symptoms with marked limitations in activities of daily living, social interaction, concentration, persistence or pace.  T13.  The ALJ found that Ms. R.'s mental impairments caused mild limitations in her ability to understand, remember, or apply information, mild limitations in her ability to interact with others, moderate limitations in concentration, persistence or maintaining pace, and mild limitations in adapting or managing oneself.  T14.

3

The ALJ determined that Ms. R. had residual functional capacity, ("RFC"), to:

> perform less than the full range of light work . . . . The claimant is limited to lifting and carrying 20 pounds occasionally and 10 pounds or less frequently. The claimant is limited to sitting (with normal breaks) for about 6 hours out of an 8-hour workday. The claimant is limited to standing or walking (with normal breaks) for about 3 hours out of an 8-hour workday. The claimant has no reaching limitations. The claimant is limited to frequent balancing, stooping and crouching. The claimant is limited to never climbing ladders, scaffolds or ropes. The claimant is limited to occasional kneeling, crawling and climbing ramps or stairs slowly with the use of a handrail. The claimant has no communication or manipulation limitations and no visual limitations with proper glasses. The claimant is limited to avoiding concentrated exposure to work hazards such as unprotected heights and fast or dangerous machinery. Secondary to pain, discomfort, side effects of medications and some overlay of mental impairments, the claimant is limited to understanding, remembering and carrying out simple, routine and repetitive tasks of about 2-3 steps on average.

T15.

The ALJ found that Ms. R.'s impairments could reasonably be expected to cause the symptoms alleged by Ms. R., however her statements concerning the intensity, persistence and limiting effects of those symptoms were "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." T16.

The ALJ found at Step Four that Ms. R. could not perform her past relevant work as a bartender, routine clerk, administrative clerk, cashier checker, sales attendant, and housekeeper. T20-21.

The ALJ found that Ms. R. had a "limited education" and was able to communicate in English. T21.

4

The ALJ found at Step Five, relying on the testimony of a vocational expert, that Ms. R. could perform the occupations of electronics worker, DOT# 726.687-010; hand packager, DOT# 589.687-074; and small products assembler, DOT# 706.687-022, relying on the number of jobs available in the national economy for each occupation.  T21-22.  The ALJ found the vocational expert's testimony was inconsistent with the information in the Dictionary of Occupational Titles because the jobs identified were light duty jobs that typically called for 6 hours of standing or walking, but the vocational expert's testimony that the jobs could be performed within the limits of the hypothetical and that the numbers of jobs provided included the erosion of the incidence in the national economy of those jobs based on reduced standing and walking limits that was based on the expert's 20 years of vocational consultancy experience was reasonable.  T22.

The ALJ considered the opinions of the State agency medical consultants and rejected their findings because they were not consistent with the medical records.  T19.

The ALJ considered the opinions of the State agency psychological consultants and rejected their findings because, when Ms. R.'s mental impairments are considered in combination with her chronic pain syndrome, she is limited to unskilled work.  T20.

The ALJ considered the opinions of Kimberly Lunder, PA-C, Ms. R.'s treating provider, and stated that PA Lunder completed a mental impairment form indicating "marked limitations in sustaining concentration with no other

significant limitations noted." T19.  The ALJ stated, "The undersigned accepts those statements and affords them great weight . . . ." T19.  The ALJ considered the physical impairment form PA Lunder completed and rejected her opinions that Ms. R. had manipulative and reaching limitations, and that Ms. R. would need extra breaks and would have excessive absenteeism because the ALJ concluded those limitations were inconsistent with the "physical examination observations in the record documenting good strength, full range of motion and good response to conservative treatment." T19.  The ALJ also considered a short-term disability form from November 2016 completed by PA Lunder and gave it little weight.  T19.  The ALJ also considered a February 2018 letter from PA Lunder which restricted Ms. R. to less than full-time work and other limitations and afforded the opinion "less weight, as they are not consistent with the physical examination observations in the record documenting good strength, full range of motion and good response to conservative treatment."  T19.

The ALJ considered an April 2018 letter from Christine Knapp, MSW, stating that Ms. R. qualified for a service animal due to her condition and gave it little weight stating it contained no vocationally relevant limitations.  T19.

The ALJ considered a third-party function report from Ms. R.'s friend, Erin Jones, and afforded it weight to the extent it supported the RFC determined by the ALJ.  T19.

The ALJ stated Ms. R. was obese, which compounds her fibromyalgia problems.  T20.

Ms. R. requested review of the ALJ's denial from the Appeals Council, which was denied, making the ALJ's decision final.  T1-5, 258.  Ms. R. timely filed this action.

**B.    Relevant Medical Evidence (chronological order):**

**1.    2015**

Ms. R. was seen for physical therapy at Prairie Rehabilitation for cervicalgia and thoracic pain and received treatments on October 2, 6, 9, 12, 14, 2015, and was discharged on October 28, 2015, with improved pain and she had returned to work.  T507-18.

Ms. R. was seen at AMG Integrative Clinic on October 15, 2015, for ongoing neck, shoulder, and upper back pain.  T399.  Ms. R. also reported a history of migraine headaches, which got worse over the years.  T400.  Ms. R. had tried chiropractic treatment, physical therapy, been to the emergency room, and had been evaluated by orthopedics.  T400.  She was taking gabapentin and using a TENS unit.  T400.  Ms. R. also reported occasionally her left forearm will be achy, numb and tingly.  T400.  Her assessment was possible myofascial pain or fibromyalgia and acupuncture, trigger point injections, and aromatherapy were discussed.  T401.  Acupuncture was started and continued periodically through June 2016.  T403-27.

**2.    2016**

Ms. R. saw PA Lunder at Avera McGreevy Clinic on March 24, 2016, for follow-up on her gabapentin, which had been increased at her last visit.  T687. Ms. R. reported she had returned to work since the increased dosage, but had

body aches since returning, and continued to receive acupuncture treatment. T687.  Ms. R.'s gabapentin dosage was increased.  T690.

Ms. R. was seen at the Avera Emergency Room for a migraine headache on March 27, 2016.  T467.

Ms. R. saw PA Lunder at Avera McGreevy Clinic on August 16, 2016, for increased generalized pain and reported the gabapentin and Ibuprofen were no longer working, her depression had increased with her pain, and she had quit her second job because of tiredness and pain.  T675.  Ms. R. also reported numbness in her right leg at night and in her fingers.  T675.  Ms. R.'s PHQ-9 score was 23, indicating a need for depression treatment.  T677.

Ms. R. saw PA Lunder at Avera McGreevy Clinic on September 8, 2016, for a headache lasting two days and generalized chronic aches and pains. T670.  She received a Toradol injection, was continued on Effexor and gabapentin, and was started on Mobic for pain.  T673.  Examination revealed tenderness in her neck and generalized musculoskeletal tenderness, sad mood, and tearful affect.  T679.  Ms. R.'s assessment included fatigue, multiple joint pain, headache, paresthesia of upper and lower extremities, and depression with anxiety.  T679-80.  Ms. R. received a Toradol injection, a brain MRI was ordered, gabapentin dosage was increased, due to her generalized pain her antidepressant was changed to Effexor, and a rheumatology referral was discussed.  T680.

The Avera McGreevy notes for October 6, 2016, stated that Ms. R. saw Dr. King and was diagnosed with fibromyalgia.  T752.

Ms. R. was seen at Avera Physical Therapy on October 10, 2016, for a new diagnosis of fibromyalgia. T461. Ms. R. described her pain as alternating between aches/cramps and being on "fire;" times with sharp pain in the wrists, elbows, shoulders, knees, and ankles; and, times when light massage felt good and other times when she could not stand to be touched. T461. Her pain was worse with driving, extended sitting or standing, and improved slightly with hot baths, quiet time, and sometimes when lying down. T461. Ms. R. had filed for FMLA due to her inability to do her job. T461. Ms. R. reported being unable to do laundry, dishes, write in her diary, ride her motorcycle, play with her dog, or play with her grandchild. T461. Examination revealed diffuse tenderness bilaterally to cervical musculature, scapular musculature, lumbar paraspinals, PSIS, greater trochanters, and piriformis muscles; shoulders able to move 90 degrees at normal pace then slows, and all muscles tested 3+/5 or empty end feel secondary to pain; grip strength was weak and painful, much weaker than expected for someone who moves boxes for a living; positive cervical Spurling test indicating pressure on the nerve root, positive lumbar straight leg raise at 38 degrees on the right and 36 degrees on the left, and a negative slump test. T463. The Oswestry[3] index was 54% disability, indicating a severe disability with impact on activities of daily living. T463. Aquatic therapy, manual therapy, and neurological re-education were planned. T464.

---

[3] See
https://www.rehab.msu.edu/_files/_docs/Oswestry_Low_Back_Disability.pdf.

Ms. R. saw PA Lunder at Avera McGreevy Clinic on October 18, 2016 to discuss FMLA paperwork and follow-up after starting Lexapro. T660. Ms. R. had seen Rheumatology and been diagnosed with fibromyalgia, continued to have widespread pain, and had missed 4 out of 5 days of work that week due to pain. T660. Ms. R.'s work had encouraged her to file FMLA paperwork. T660. Ms. R. reported tolerating the Lexapro but was not sure it helps as she felt depressed with chronic pain. T660. Examination revealed tenderness in her neck and back, sad mood, and tearful and downcast affect. T662-63. She was referred to Behavioral Health chronic pain group and for physical therapy. T663.

Ms. R. had to cancel planned water physical therapy on October 22, 2016, due to not being able to afford the copay required by her insurance. T457.

Ms. R. was referred to Avera Physical Therapy for treatment of a recent fibromyalgia diagnosis on October 24, 2016, and reported neck, back, shoulder, arm, hip, knee and leg pain. T446. She also reported a history of anxiety attacks, which could occur without reason. T446. Ms. R. was taking gabapentin, pain medication, and anxiety medication and she was on FMLA from work for disability. T446.

### a.    Lunder Mental Impairment Questionnaire

On November 2, 2016, PA Lunder completed a mental impairment questionnaire (T433-36), physical impairment questionnaire (T437-38), and separate onset date questionnaires (T439-40).

On the mental impairment questionnaire, PA Lunder reported that Plaintiff's diagnoses were "fibromyalgia; depression/anxiety due to health condition" (T433). She opined that Plaintiff had slight limitation in the ability to maintain attention and concentration for extended periods; moderate limitation in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; moderate limitation in the ability to perform at a consistent pace with a standard number and length of rest periods; and no limitation in any of the other assessed mental abilities (T433-35). PA Lunder stated on the form that at times Ms. R. may be slower to complete tasks or require more rest periods due to pain/mental fatigue due to diagnosis. T434. On the corresponding onset date questionnaire, PA Lunder indicated that she had treated Ms. R. since July 2014, and Ms. R. had experienced these mental limitations since July 2014 (T440).

### b. Lunder Physical Impairment Questionnaire

On the physical impairment questionnaire, PA Lunder reported that Ms. R.'s diagnoses included "fibromyalgia; chronic pain; depression/anxiety" and that her symptoms "often" were severe enough to interfere with the attention and concentration required to perform simple work-related tasks (T437). PA Lunder opined that Ms. R. could walk 6 blocks without rest or significant pain; stand/walk for 20 minutes at a time and 4 total hours in an 8-hour workday; sit for an hour at a time and 8 total hours in an 8-hour workday; and Ms. R. would need a job that allowed her to shift positions at will

11

between sitting, standing or walking.  T437.  PA Lunder opined Ms. R. could frequently lift and carry less than 10 pounds and occasionally lift and carry 20 pounds (T437-38).  She opined that Ms. R. would need to take 1-2 15-minute unscheduled breaks during an 8-hour workday (T437).  She marked that Ms. R. had no limitations in performing repetitive reaching, handling, or fingering, but then indicated that Ms. R. could use each hand only 50% of the time to grasp, turn, or twist objects and use each arm only 50% of the time for reaching (T438).  PA Lunder estimated that Ms. R. would be absent from work more than four times a month, stated that it was "unknown" whether Ms. R. was a malingerer, and indicated that Ms. R. would be physically unable to work an 8-hour day, 5 days a week on a sustained basis (T438).  On the corresponding onset date questionnaire, PA Lunder indicated that Ms. R. had experienced these physical limitations since August 2016 (T439).

### 3.    Late 2016

Ms. R. received biofeedback treatment for pain management starting on November 4, 2016, at Avera Behavioral Health and was discharged on May 24, 2017, with moderate improvement.  T557.

Ms. R. was discharged from Avera Physical Therapy on November 8, 2016.  T442.  Physical therapy was needed due to decreased cervical and upper extremity range of motion, decreased strength, and increased pain.  T444. Spinal tests revealed a positive cervical Spurling test indicating pressure on the nerve root, positive lumbar straight leg raise at 38 degrees on the right and 36

degrees on the left, and a negative slump test.  T444.  The Oswestry[4] index was 54% disability, indicating a severe disability with impact on activities of daily living.  T444.

On November 10, 2016, PA Lunder provided a short-term disability claim form estimating that Ms. R. would be able to return to work on November 29, 2016 (T474).

Ms. R. was seen at Sanford Women's Clinic on November 17, 2016, and diagnosed with overactive bladder; an interstitial cystitis diet was recommended, and Ditropan prescribed.  T479.

PA Lunder noted on November 18, 2016, that she felt Ms. R. should attempt at least part-time work, because the worst thing she can do is sit at home.  T743.  PA Lunder stated Ms. R. needed to be planning for the future and she was not likely to get disability with fibromyalgia as they would expect her to get a desk job.  T743.  PA Lunder stated Ms. R. would either need to find a less physical job or part-time work, and she could not "continue to say she is disabled as she could do a less physical job at least part-time . . . .  [L]iving off disability is not a long term solution at her age."  T743.

Ms. R. was referred by PA Lunder for a psychological evaluation at Avera University Psychiatry and seen on December 29, 2016.  T485.  Ms. R. presented as irritable and angry and stated she had no clue why she was sent to Psychiatry.  T485.  She reported suffering from chronic pain and

---

[4] See https://www.rehab.msu.edu/_files/_docs/Oswestry_Low_Back_Disability.pdf.

fibromyalgia, as well as chronic headaches, and her primary care provider sent her because she was depressed.  T485.  Ms. R. fell asleep in the waiting room and reported she gets easily exhausted.  T485.  Ms. R.'s medications included gabapentin, etodolac, and Tylenol 300 for inflammation or pain, cyclobenzaprine, a muscle relaxant, and Effexor, Lexapro and lorazepam for depression and anxiety.  T486.  Ms. R.'s mental health diagnoses were depression and anxiety due to general medical condition, and her general medical diagnoses were chronic pain syndrome and fibromyalgia.  T486. Ms. R. declined continued care with Psychiatry and felt she needed to manage her pain and inquired about a referral to a pain clinic.  T487.

### 4.   2017

Ms. R. saw PA Lunder at Avera McGreevy Clinic on January 2, 2017, for FMLA paperwork and she had been off work since October, and prior to that time she had been missing a lot of work. T645.  Ms. R.'s leave from work was extended to February 13, 2017, and she was referred to Midwest Pain and Rehab Center.  T648.

Ms. R. was seen for physical therapy on January 2, 2017, at Prairie Rehabilitation and reported global pain and discomfort due to fibromyalgia impacting her ability to perform daily activities, work duties, sleep, and her mobility.  T502, 505.  Ms. R.'s assessment noted poor posture, limited cervical range of motion, limited upper extremity range of motion and strength, and significant decrease in lower extremity ankle DF causing compensatory forward leaning.  T505.

Ms. R. was seen for physical therapy on January 5, 2017, at Prairie Rehabilitation and reported some reduction in pain from prior treatment for 3-4 hours, but had two intense migraines on consecutive days thereafter, and requested more education on the occipivot.  T500.

Ms. R. was seen for physical therapy on January 9, 2017, at Prairie Rehabilitation and reported waking with a headache that was progressing to a migraine.  T498.

Ms. R. was seen on January 13, 2017, at Midwest Pain and Rehabilitation for "mostly" headaches, upper back and shoulder area pain, and also widespread pain.  T523.  Ms. R. was on short-term disability from work. T523.  Examination revealed increased muscle tone and tension, tenderness, and active tenderpoints in multiple areas consistent with fibromyalgia, abnormal reduction in cervical lordosis, reduced cervical spine range of motion, end range motion discomfort in shoulders, and posture with forward bended head and protracted shoulders.  T523.  Ms. R.'s assessments were chronic cervical upper back pain, chronic musculoligamentous tension headaches, myofascial pain syndrome, fibromyalgia and depression.  T523.  Trigger point injections, pain management, physical therapy, posture retraining, and education, including pacing activities and exercise level, and continued medications unchanged were planned.  T524.

Ms. R. was seen at Avera Behavioral Health on February 3, 2017, for help with pain management.  T1034.  Ms. R. was on short-term disability from work and had pain across her chest, down her entire back, both arms, hips,

legs and knees described as achy, sore, tingling, and burning. T1035. Ms. R. reported the pain caused a lot of numbness in her hands and fingers the past two months. T1035. Ms. R.'s pain impacted her ability to lift, walk, bend, stretch, wash dishes, sweep, mop, vacuum, go up and down steps, fold laundry, grip things, or hold smaller items. T1035. Ms. R.'s mental status showed mildly pressured speech, slowed and restless psychomotor activity, depressed, irritable, dysphoric, anxious, worried, frightened, and quite frustrated mood due to pain, and congruent, restricted, downcast affect. T1035-36. Cognitive Behavior Therapy, stress management, cognitive restructuring collaboration, relaxation technique and other therapies were planned. T1036.

Ms. R. saw PA Lunder at Avera McGreevy Clinic on February 22, 2017, for issues with her speech in which words and sentences do not come out right and some garbled speech the last month and a half. T638. Ms. R. reported constant left-sided weakness the past two weeks and increased "joint swelling" on the left, increased shakiness and tremor, fatigue, and leg pain. T638-39. Examination revealed bilateral tremors in her hands, and she was referred to neurology. T642-43.

Ms. R. spoke with the Avera McGreevy Clinic on February 28, 2017, and stated she had no plans to return to work at that time because if she returned to work, she would have more flare-ups, as she was unable to do her housework without added pain. T724.

16

PA Lunder noted on March 2, 2017, that Ms. R. should return to work on a reduced schedule or part-time basis.  T724.

Ms. R. was seen at the Avera Emergency Room for a migraine headache on March 18, 2017.  T548.  She reported dizziness, difficulty walking, double vision, nausea, and photophobia.  T548.  Ms. R. also reported chronic left-sided numbness and weakness unchanged. T548.  A migraine cocktail was given and a brain MRI was obtained, which was negative for acute abnormality. T550, 554.

Ms. R. was seen on March 29, 2017, at Avera Neurology for tremors that started about two months prior occurring mainly in her hands and worse with activity like using utensils and includes numbness and tingling in both arms diffusely as well as over the anterior aspect of her thighs.  T535-36.  Ms. R. had been diagnosed with fibromyalgia due to persistent body pain, fatigue, and paresthesias.  T536.  Ms. R. also reported a history of chronic headaches occurring daily with more severe headaches once per week, including light and sound sensitivity and nausea.  T536.  A brain MRI obtained in August 2016 was unremarkable.  T537.  An EEG was obtained on April 3, 2017, due to cognitive and memory problems that was abnormal showing focal sharp waves in the left temporal region, which could potentially represent epileptogenic focus.  T543.  Upper and lower extremity nerve conduction tests were obtained and were unremarkable.  T544.  Examination revealed a mild action tremor. T537.  Ms. R.'s assessments were mild essential type tremor predominantly in the upper extremities, and chronic daily headaches for which Inderal was

prescribed; fibromyalgia with diffuse chronic pain disorder; and cognitive and memory difficulties, which may be related to the fibromyalgia. T535.

Ms. R. was seen on May 8, 2017, at Avera Neurology for another EEG due to cognitive and memory problems. T930. The EEG was abnormal showing rare sharply contoured waves in the right frontotemporal region as well as an episode of rhythmic slowing potentially consistent with epileptogenic focus. T930.

Ms. R. saw PA Lunder at Avera McGreevy Clinic on May 31, 2017, for a medication check and work restriction paperwork. T632. Ms. R. had been receiving physical therapy at Prairie Rehabilitation who suggested a functional capacity evaluation to try to get Ms. R. back to work. T632. Ms. R. continued to have generalized pain rated at 6/10. T634. PA Lunder referred Ms. R. for a functional capacity assessment and said she would like to get Ms. R. back to work as soon as possible. T636. PA Lunder said Ms. R.'s work restrictions would include no lifting above her head, no lifting over 20 pounds, and she would talk with the physical therapist and then complete the restriction paperwork. T636.

PA Lunder noted on June 5, 2017, that Ms. R.'s insurance would not cover the testing related to work restrictions, but Prairie Rehab would do something similar at her next rehab appointment. T711.

Ms. R. contacted Avera McGreevy Clinic on June 16, 2017, and said she needed a specific date when her work restrictions would be lifted. T709. The date could be extended but Aetna needed a specific date. T709.

18

Ms. R. saw Christine Knapp, MSW, CSW-PIP, for counseling on June 20, 2017, and reported she was on long-term disability from work.  T613.

Ms. R. saw Ms. Knapp for counseling on August 1, 2017, and was observed to be "really physically hurting."  T609.  It was difficult for her to sit still comfortably due to back and leg pain.  T609.

Ms. R. saw Ms. Knapp for counseling on August 15, 2017, and had gone to Sturgis with her boyfriend the last weekend and had fun, but had been in a lot of physical pain the last several days.  T608.

Ms. R. was seen at Dakota Chiropractic on November 13, 2017, for mid back pain.  T891.

Ms. R. saw Ms. Knapp for counseling on November 21, 2017, and Ms. Knapp noted that Ms. R. had missed a couple of appointments due to "sick/weak/tired/physically in pain" and she was not doing much better that day.  T857.  Ms. R. was seen at Dakota Chiropractic on December 1, 2017, for neck pain.  T890.

Ms. R. saw Ms. Knapp for counseling on December 5, 2017, and Ms. Knapp noted Ms. R. appeared to be in a lot of pain, she repeated things she was talking about several times, and cried when talking about her pain and health problems.  T855.  Ms. Knapp stated she felt Ms. R.'s pain and physical issues cause her a lot of mental stress also.  T855.  Ms. R. was seen at Dakota Chiropractic on December 28, 2017, for neck pain.  T889.

Ms. R. was seen on December 29, 2017, at Avera Neurology to follow-up on her headaches, tremors and amnestic spells.  T931-32.  Keppra had been

19

prescribed due to her abnormal EEGs, and Ms. R. reported her spells were
improved but still had a few per week but was more aware that she may lose
her train of thought or get distracted easily.  T932.  Ms. R. reported continued
headaches with one mild and three severe headaches per week with some
photo and phonophobia.  T932.  Ms. R.'s assessments included tremor, chronic
daily headaches, fibromyalgia with diffuse extremity pain and paresthesias,
and cognitive and memory difficulties with periods of lost time and confusion.
T931.  Examination revealed tenderness to palpation over the greater and
lesser occipital nerves, and palpable spasm over bilateral trapezius.  T933.
Occipital nerve block injections were administered due to persistent headaches
despite preventative use of propranolol as well as trigger point injections.
T931, 937.

### 5.    2018

Ms. R. saw Ms. Knapp for counseling on January 17, 2018, and
Ms. Knapp noted Ms. R. was not doing well physically and was very weak and
in a lot of pain.  T854.

Ms. R. was seen at Dakota Chiropractic on January 25, 2018, for pain
and numbness in her left shoulder.  T888.

On February 12, 2018, PA Lunder provided a letter stating that Plaintiff
was under her care and currently had work restrictions that prevented her
from performing any available work at UPS (T821).  PA Lunder stated that
Ms. R. was limited to working 4-hour shifts, 4 days per week; could not
repetitively lift more than 10 pounds or otherwise lift more than 20 pounds;

and, ideally, would have a combination of standing and sitting during her shifts (T821).  She stated that there was no date set for Ms. R. to return to work without restrictions and that these restrictions were considered permanent (T821).  PA Lunder invited further contact if more information was needed.  T821, 917.

Ms. R. saw Ms. Knapp for counseling on February 22, 2018, and Ms. Knapp noted Ms. R. was in a lot of physical pain and she was frustrated with her doctors who she did not think were really listening to her or diagnosing her correctly.  T853.

Ms. R. saw Ms. Knapp for counseling on March 13, 2018, and Ms. Knapp noted Ms. R. had many physical issues.  T852.  She aches all over her body, has difficulty getting around the house at times, was not eating well and it was difficult for her to concentrate on the counseling session.  T852.

Ms. R. saw Ms. Knapp for counseling on March 27, 2018, and Ms. R. had almost cancelled, reporting her pain drains her many days of the week.  T851.

On April 6, 2018, social worker Christine Knapp provided a letter stating that she had been working with Ms. R. "on and off, for several years" on relationship issues starting during Ms. R.'s childhood, and recently also had been addressing physical health issues and self-care (T850).  Ms. Knapp reported that Ms. R. relied on "loving" animals in her day-to-day life to "help her focus on healthy things and help her to love herself better also" (T850).  Ms. Knapp stated, "It is important for [Ms. R.] to be able to have animals

21

around her, especially now, because of their unconditional love for their owners" (T850).

Ms. R. saw Ms. Knapp for counseling on April 10, 2018, and Ms. Knapp noted that not much had changed.  Ms. R. continued to be in a lot of pain and could not do much on some days.  T849.

Ms. R. saw Ms. Knapp for counseling on May 8, 2018, and had been better physically and able to have fun, go out with friends and spend time with her guy friend.  T848.  Ms. Knapp noted that Ms. R. is such a different person when not in pain.  T848.

Ms. R. contacted Avera McGreevy Clinic on May 10, 2018, complaining of muscle spasms the last 1.5 weeks due to a fibromyalgia flareup.  T915.

Ms. R. was seen on May 10, 2018, at Avera Neurology to follow-up on her headaches and tremor and reported having muscle spasms and twitching in the right upper extremity around the elbow with radiation up the left arm to the shoulder and neck with sharp pain.  T940-41.  Ms. R.'s headaches had shown some significant improvement and the headaches were occurring about once per week and she was using sumatriptan.  T941.  Examination revealed tenderness to palpation over the occipital regions, and muscle spasm and tenderness over the medial trapezius.  T941.  Occipital nerve block injections and trigger point injections were administered.  T946.  A cervical MRI was recommended for the neck pain with radiation to the left upper extremity, which showed stable mild degenerative spondylosis with minimal central

annular protrusions at C2 to C5 with no nerve root impingement or foraminal stenosis.  T940, 947.

PA Lunder wrote a letter on May 16, 2018, stating Ms. R. needed a first or second level apartment due to her medical condition, causing stairs to be problematic.  T918.

Ms. R. saw Ms. Knapp for counseling on May 22, 2018, and had been out more frequently the last couple of weeks, and she was happy about that, but it still wears on her in many ways.  T847.  Ms. R. saw Ms. Knapp for counseling on June 14, 2018, and was trying to get an apartment on the first floor of her building.  T846.

Ms. R. was seen on June 22, 2018, at Avera Gastroenterology for follow-up on a history of gastroparesis with reflux and irritable bowel syndrome. T826-27.  Ms. R.'s assessments included GERD and irritable bowel syndrome. T826.

Ms. R. saw Ms. Knapp for counseling on July 3, 2018, and Ms. Knapp stated that Ms. R. had helped over the weekend with a fundraiser and had been paying for it physically since then.  T845.

Ms. R. was seen at Dakota Chiropractic on July 10, 2018, for upper back pain, and was seen again a week later.  T885-87.

Ms. R. saw PA Lunder at Avera McGreevy Clinic on August 1, 2018, for a medication check.  T898.  Ms. R. had applied for several jobs but had not been hired due to her pain, fibromyalgia and fatigue.  T898.  Ms. R. reported neck, back, joint, and muscle pain, and her medications were continued.  T902.

Ms. R. was seen on August 9, 2018, at Avera Neurology to follow-up on her headaches and tremor and reported back pain with radiation to her hips and legs, worse with extended sitting or lying, and was using Imitrex 2-3 times a week to stave off severe headaches.  T951.  Ms. R.'s propranolol dosage was increased in an effort to reduce her use of Imitrex.  T949.

Ms. R. was seen at Dakota Chiropractic on August 14, 2018, for upper back pain.  T884.

Ms. R. saw Ms. Knapp for counseling on October 10, 2018, and Ms. Knapp stated that Ms. R. was still frustrated about her physical health and she hurts everywhere all the time.  T993.  Ms. R. saw Ms. Knapp for counseling on November 1, 2018, and Ms. Knapp stated that Ms. R. was getting physically better from weeks of not feeling well.  T994.  Ms. Knapp stated it had been difficult for Ms. R. to get through a day without needing to sleep or be in bed a majority of the day and she did not have much ability to focus on her emotional well-being.  T994.

Ms. R. was seen on November 26, 2018, at Avera Rheumatology to follow-up on her positive ANA, arthralgia, myalgia, and mild sicca symptoms. T964.  Ms. R. had been seen by Rheumatology in October 2016[5] for an evaluation of positive ANA with arthralgia, myalgia, and mild sicca symptoms. T964.  Ms. R. reported hip and knee pain with extended sitting, difficulty walking, decreased grip strength with pain of MCP, PIP, DIP and bilateral wrists, more frequent headaches, decreased balance, chest pain, morning

---

[5] The October 2016 Rheumatology records do not appear in the transcript.

stiffness of elbows, wrists, knees, and hips, and joint swelling in ankles, knees, can no longer wear rings, and wrists (less).  T964-65.  Ms. R. reported pain in her ankles, back, elbows, hips, knees, neck, shoulders and wrists.  T967, 969.  Examination revealed chest tenderness to palpation, diffuse tender points including 18/18 fibromyalgia tenderpoints, and Ms. R. declined full range of motion testing in her shoulders due to pain.  T970.  Ms. R.'s symptoms were consistent with fibromyalgia, but tests to make sure she had no inflammatory arthritis were planned.  T972.  No significant arthritis was seen in hand and foot x-rays.  T973-74.

Ms. R. was seen on December 11, 2018, at Avera Neurology to follow-up on her headaches and tremor and reported things had been going "fair." she was having more difficulty with joint pain and her rheumatoid factor was elevated.  T1018-19.  Ms. R.'s headaches were somewhat worsening and occurring about twice per week and she had been to the emergency room about a month ago due to an intractable headache.  T1019-20.

**6.    2019**

Ms. R. was seen at Avera Gastroenterology on January 7, 2019, and diagnosed with celiac disease in addition to gastroparesis, bloating, GERD, and irritable bowel syndrome.  T1009-10.

Ms. R. was seen on February 20, 2019, at Avera Neurology for nerve block and trigger point injections due to muscle spasms and myofascial pain in her left shoulder going up her neck into her head causing occipital neuralgia and a migraine.  T1026.

25

Ms. R. saw Ms. Knapp for counseling on March 12, 2019, and Ms. Knapp stated that Ms. R. was physically terrible and in pain much of the time. T1040.

Ms. R. was seen on March 13, 2019, at Avera Rheumatology to follow-up and reported still being in a lot of pain and had been to the emergency room a few times and had been prescribed meloxicam that seemed to take the edge off the pain, and she had been diagnosed with Celiac disease and gastroparesis. T1044.  Ms. R. reported morning stiffness that she didn't feel ever loosens up. T1044.  Examination revealed positive heberdens and bouchards nodes, bony hypertrophy in both knees with crepitus, and 11/18 muscle tenderpoints. T1048-49.  Ms. R. did not have insurance, so she was continued on gabapentin rather than switched to Lyrica, and continued on meloxicam and Flexeril. T1049.  The Rheumatologist also stated, "I think she is having some joint pain and fatigue from the celiac disease as well . . . ."  T1049.

### 7.    State Agency Assessments—2017

On July 14, 2017, state agency psychological consultant Stephanie Fuller, Ph.D., reviewed Ms. R.'s records and concluded that her mental impairments were non-severe (T83-84).  Dr. Fuller concluded that Ms. R. had medically determinable impairments of Depressive, Bipolar and Related Disorders and Anxiety and Obsessive – Compulsive Disorders that caused mild limitation in understanding, remembering, or applying information; mild limitation in interacting with others; mild limitation in concentrating, persisting, or maintaining pace; and no limitation in adapting or managing oneself (T84).

26

On July 25, 2017, state agency medical consultant Jay Shaw, M.D., reviewed Ms. R.'s records and concluded that her fibromyalgia and migraines were severe impairments (T83, 87).  Dr. Shaw concluded that Ms. R. had no exertional, manipulative, visual, communicative, or environmental limitations (T86).  Dr. Shaw concluded that Ms. R. had postural limitations and could never climb ladders, ropes, or scaffolds; could occasionally kneel, crawl, and climb ramps and stairs; and could frequently balance, stoop, and crouch (T86). Dr. Shaw stated that the limitations were from obesity.  T86.

On October 26, 2017, state agency medical consultant Lawrence Schaffzin, M.D., reviewed Ms. R.'s records and concluded that her fibromyalgia and migraines were severe impairments (T114, 117).  Dr. Schaffzin concluded that Ms. R. had no exertional, manipulative, visual, communicative, or environmental limitations (T116-17).  Dr. Shaw concluded that Ms. R. had postural limitations and could never climb ladders, ropes, or scaffolds; could occasionally kneel, crawl, and climb ramps and stairs; and could frequently balance, stoop, and crouch (T116-17).

On November 4, 2017, state agency psychological consultant Joel Deloy, Ph.D., reviewed Ms. R.'s records and concluded that her mental impairments were non-severe (T114-15).  Dr. Deloy concluded that Ms. R. had medically determinable impairments of Depressive, Bipolar and Related Disorders and Anxiety and Obsessive – Compulsive Disorders that caused mild limitation in understanding, remembering, or applying information; mild limitation in

interacting with others; mild limitation in concentrating, persisting, or maintaining pace; and no limitation in adapting or managing oneself (T114).

## C.    Other Evidence:

The record contains an insurance explanation of benefits that stated that Ms. R. was on short term disability and her last day worked had been October 12, 2016.  T279.

Erin Jones completed a third-party function report regarding Ms. R. on October 3, 2017.  T345-52.  Jones stated she sees Ms. R. a few times per week and talks to her daily.  T345.  Jones stated Ms. R. could not work, she was unable to clean, do dishes, vacuum, had difficulty standing for any length of time, her arms hurt, she had severe back and hip pain, fatigue, and memory loss.  T345.  Jones stated Ms. R. was unable to lift or use her arms, and lays around most days, mostly just going to doctor appointments.  T345-46.  Jones stated Ms. R. did some laundry and general picking up but it takes her all day, and she takes a lot of breaks and needs help with the cleaning.  T347.

## D.    Testimony at ALJ Hearing:

Ms. R.'s hearing occurred on March 28, 2019, and lasted 46 minutes; starting at 7:58 a.m. and ending at 8:44 a.m.  T43, 73.

### 1.    Ms. R.'s Testimony:

Ms. R. appeared with her attorney and testified before the ALJ at an administrative hearing on March 28, 2019 (T41).

Ms. R. testified that she lived by herself in a third-floor apartment and had to take the stairs because there was no elevator, and she had requested a ground floor apartment but there was a waiting list.  T47.

Ms. R. testified that she last worked in August 2017, sorting packages and loading carts and planes for UPS, and then UPS put her on "smalls" where you sort packages and load carts.  T48.  Ms. R. testified that her work at UPS was part-time work.  T62.

Ms. R. testified that her symptoms from fibromyalgia included muscle tightness, burning, aching, cramping, and stiffness, for which she received some relief using a TENS unit, Epsom salts baths, and hot and cold packs (T51-52).  She testified that she also took a nap each day, usually for an hour and a half or two hours (T57-58). Ms. R. testified that sometimes she does not feel refreshed after sleeping.  T57.

Ms. R. testified that she received monthly injections that had reduced the frequency of her migraines from six or seven a month to about three a month; she testified the migraines could sometimes last a day and a half.  T52.

Ms. R. testified that her stomach issues would cause pain when she ate that would shoot into her back and make the rest of her body hurt, and she had issues with constipation and loose stools, bloating, and she now had celiac disease.  T53.

Ms. R. testified that she had neighbors who would help her if she had problems opening things like a bottle of pop, juice, or nail polish, or if she needed her garbage taken out.  T55.

29

Ms. R. testified that she was able to drive, although she sometimes had difficulty sitting for very long, and said she sometimes used a wheelchair when shopping (T55). She testified that she had lifting restrictions of 7 or 10 pounds and could sit and stand for about 10 to 15 minutes before needing to change positions (T58).

**2.    Vocational Expert Testimony:**

The ALJ asked the vocational expert ("VE"), a hypothetical question that mirrored the limitations included in the RFC determined by the ALJ and the VE testified that the individual would be unable able to perform past work as identified by the ALJ. T68-69. The VE testified there would be other jobs the individual could perform and identified the occupations of electronics worker, DOT# 726.687-010; inspector and hand packager, DOT# 559.687-074, and assembler, small products I, DOT# 706.684-022, and provided the number of jobs available nationally for each occupation. T69-70. The VE testified that to allow these occupations to be done with standing approximately three hours per workday she reduced the number of jobs by approximately 50 percent. T70. The VE said the reduction in numbers of jobs was based on her experience. T70.

**DISCUSSION**

**A.    Standard of Review**

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); <u>Minor v. Astrue</u>, 574 F.3d 625, 627 (8th

  
Cir. 2009).  Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975).  "This review is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a rubber stamp of the Commissioner's action."  Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (cleaned up, quotations omitted).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it.  Minor, 574 F.3d at 627.  The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision.  Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005).  If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed.  Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993).  "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record."  Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000) (citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed.  Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g).  Specifically, a court must evaluate whether

the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed.  Walker v. Apfel, 141 F.3d 852, 853 (8th Cir. 1998) (citation omitted).  The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court.  Smith, 982 F.2d at 311.

## B.     The Disability Determination and the Five-Step Procedure

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505.[6]  The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is disabled.  This sequential analysis is mandatory for all SSI and SSD/DIB applications.  Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520.  The five steps are as follows:

> **Step One**: Determine whether the applicant is presently engaged in substantial gainful activity.  20 C.F.R. § 404.1520(b).  If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

---

[6] Although Ms. R. has applied for both Title II and Title XVI benefits, for the sake of simplicity, the court herein cites to only the regulations applicable to Title II where the corresponding Title XVI regulation is identical.  It is understood that both Titles are applicable to Ms. R.'s application.  Any divergence between the regulations for either Title will be noted.

**Step Two**: Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e., whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step.  NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe.  Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a.  This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three**: Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404.  20 C.F.R. § 404.1520(d).  If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry.  Bartlett v. Heckler, 777 F.2d 1318, 1320 n.2 (8th Cir. 1985).  This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work.  Heckler v. Campbell, 461 U.S. 458, 460, (1983).  If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment*, the ALJ must proceed to step four.  NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing.  20 C.F.R. § 1520a(c)(2).

**Step Four**: Determine whether the applicant is capable of performing past relevant work (PRW).  To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe*) to determine the applicant's residual functional capacity (RFC).  If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled.  20 C.F.R. §§ 404.1520(e); 404.1545(e).  If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five**: Determine whether any substantial gainful activity exists in the national economy which the applicant can perform.  To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience.  20 C.F.R. § 404.1520(f).

## C.    Burden of Proof

The plaintiff bears the burden of proof at steps one through four of the five-step inquiry.  Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a).  The burden of proof shifts to the Commissioner at step five.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Clark v. Shalala, 28 F.3d 828, 830 (8th Cir. 1994).  "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead[] originates from judicial practices."  Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999).  The burden shifting is "a long-standing judicial gloss on the Social Security Act."  Walker v. Bowen, 834 F.2d 635, 640 n.3 (7th Cir. 1987).  Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

## D.    The Parties' Positions

Ms. R. asserts the Commissioner erred by: (1) failing to properly evaluate whether Ms. R. met or equaled a Listing at step three for fibromyalgia and migraines, (2) failing in determining Ms. R.'s physical and mental RFC, and (3) failing to carry his carried his burden at step five to identify jobs Ms. R. can perform based on substantial evidence.  See Docket No. 31 at p. 1.  The Commissioner asserts the ALJ's decision is supported by substantial evidence in the record at each step and the decision should be affirmed.  See Docket No. 32.

**E.      The ALJ's Step Three Evaluation—Migraines and Fibromyalgia**

The ALJ found at step two of the evaluation that Ms. R. suffered from severe fibromyalgia and severe migraines.  T13.  Neither of those conditions has its own Listing for use at step three.  When an impairment does not have its own Listing, the Commissioner directs its ALJs to consider whether the impairment medically equals an analogous Listing or whether it medically equals an analogous Listing in combination with at least one other medically determinable impairment.  See Social Security Ruling ("SSR") 12-2p, 2012 WL 3104869 (July 25, 2012) (fibromyalgia) and SSR 17-2p, 2017 WL 3928306 (Mar. 27, 2017) (unlisted impairments).  Remand is appropriate where the ALJ fails to identify which Listing it considered to be most closely analogous.  Miller v. Colvin, 114 F. Supp. 3d 741, 775 (D.S.D. 2015).  Ms. R. asserts the ALJ failed to consider an analogous Listing for either fibromyalgia or migraines.

Here, the ALJ wrote in connection with its step three analysis:

> The undersigned has examined all of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, and specifically considered Listing 14.09D.  The undersigned concludes the record does not support that the criteria of that Listing is [sic] satisfied. For Listing 14.09D, the medical evidence of record does not document recurrent flares of inflammatory arthritis involving two or more constitutional symptoms with marked limitations in activities of daily living, social interaction, concentration, persistence or pace.

T13.  The ALJ then went on to discuss Ms. R.'s mental impairments under step three.  T13-14.  The ALJ did not discuss Ms. R.'s migraine headaches anywhere in the step three part of its opinion.  T13-15.

35

Listing 14.09D is under the heading of immune disorders and addresses the specific condition of inflammatory arthritis.  See Listing 14.00, 14.09D. Although Ms. R. asserted rheumatoid arthritis as one of the bases for her disability application (T269), the ALJ did **not** find that rheumatoid arthritis was a severe impairment at step two.  T13.  Also, Listing 14.09D is clearly inapplicable to any of the other severe impairments *other than* fibromyalgia as found by the ALJ at step two.[7]  Therefore, it is abundantly clear that the ALJ considered Listing 14.09D as an analogous Listing for Ms. R.'s fibromyalgia. The Commissioner's guidance to ALJs specifically identifies Listing 14.09D as an appropriate analogous Listing for fibromyalgia.  See SSR 12-2p, ¶ VI.C., 2012 WL 3104869, at *6.

Ms. R. argues further that the ALJ only considered whether her fibromyalgia "satisfied" Listing 14.09D, whereas the appropriate inquiry is whether Ms. R.'s fibromyalgia is at least equal in severity and duration to the criteria for Listing 14.09D.  She argues fibromyalgia will never "satisfy" the criteria for Listing 14.09D because fibromyalgia is not inflammatory arthritis. Ms. R. does not analyze the medical evidence to demonstrate that her fibromyalgia is equal in severity and duration to the criteria in Listing 14.09D.

It is Ms. R.'s burden to show that the medical evidence in her case demonstrates that her fibromyalgia, alone or in combination with other conditions, meets or equals an analogous Listing in severity.  Pate-Fires v.

---

[7] The other severe impairments were migraines, anxiety and affective disorder.

Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  She has not done this.  Although she points to evidence which satisfies the durational requirement, she has not pointed out any evidence in the record demonstrating that she meets or equals the severity requirements for Listing 14.09D[8], nor does she identify any other analogous Listing for fibromyalgia and demonstrate that she meets or equals the requirements for that other Listing.  The court rejects Ms. R.'s assertion that the ALJ erred in considering her fibromyalgia at step three.

The court reverses and remands, however, based on the ALJ's failure to discuss Ms. R.'s migraine headaches at all at step three.  See T13-15.  The ALJ found migraines to be a severe impairment at step two.  T13.  Migraines, like fibromyalgia, do not have a dedicated Listing.  Instead, the Commissioner directs ALJs to consider closely analogous listed impairments.[9]  See SSR 17-2p, ¶ 2, 2017 WL 3928306, at *2.  Because the ALJ did not discuss Ms. R.'s migraines at step three, did not discuss the criteria for any closely analogous listed impairments, and did not identify a closely analogous Listing to which Ms. R.'s migraine signs and symptoms were being compared, the court cannot review the ALJ's step three decision with regard to migraines.  Accordingly,

---

[8] Listing 14.09D requires repeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at marked level: (1) limitation of activities of daily living, (2) limitation in maintaining social functioning, or (3) limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

[9] After the ALJ issued its written decision in this case, the Commissioner published SSR 19-4p, which directs ALJs to consider Listing 11.02 (epilepsy) the most closely analogous listed impairment to primary headache disorders. See SSR 19-4p, ¶ 8, 2019 WL 4169635, at *7 (Aug. 26, 2019).

reversal and remand is warranted so that the ALJ can tell the court and Ms. R. what its analysis of migraines is at step three.  Miller, 114 F. Supp. 3d at 775.

The Commissioner argues that the failure to consider Ms. R.'s migraines at step three should be considered harmless error unless Ms. R. can demonstrate that the medical evidence in the record shows she meets or equals some Listing.  Ms. R. does not have the burden to evaluate her migraine impairment against any one of several potentially applicable Listings.  Rather, it is the ALJ's burden in the first instance to articulate its decision in such a way that it is subject to meaningful judicial review.  This the ALJ failed to do with regard to migraines at step three.[10]  The court accordingly reverses and remands for that reason.

**F.     The ALJ's Formulation of RFC at Step Four**

Ms. R. argues the ALJ failed to properly determine her physical RFC because it did not properly evaluate limitations from her fibromyalgia and migraines.  She also argues the ALJ failed to include appropriate limitations from her mental impairments in her mental RFC.

**1.     The Law Applicable to RFC Formulation**

Residual functional capacity is "defined as what the claimant can still do despite his or her physical or mental limitations."  Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001) (citations omitted, punctuation altered).  "The RFC

---

[10] Listing 11.02A requires a showing that the claimant experienced generalized tonic-clonic seizures occurring at least once a month for three consecutive months.  Listing 11.02A.  Ms. R. points to medical evidence arguably satisfying these requirements for frequency and duration, thus at least establishing a colorable argument for meeting this Listing.

assessment is an indication of what the claimant can do on a 'regular and continuing basis' given the claimant's disability.  20 C.F.R. § 404.1545(b)."  Cooks v. Colvin, No. CIV. 12-4177-KES, 2013 WL 5728547, at *6 (D.S.D. Oct. 22, 2013).  The formulation of the RFC has been described as "probably the most important issue" in a Social Security case.  McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982), abrogation on other grounds recognized in Higgins v. Apfel, 222 F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must consider all a claimant's mental and physical impairments in combination, including those impairments that are severe and those that are not severe.  Lauer, 245 F.3d at 703; SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996).  Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on *all* relevant evidence . . . a claimant's residual functional capacity is a medical question."[11]  Lauer, 245 F.3d at 703 (citations omitted) (emphasis added).  Therefore, "[s]ome medical evidence, . . ., must support the determination of the claimant's RFC, and the ALJ should obtain medical

---

[11] Relevant evidence includes:  medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributable to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations.  See SSR 96-8p, 1996 WL 374184, at *5.

evidence that addresses the claimant's ability to function in the workplace." Id. (citations omitted).

"The RFC assessment must always consider and address medical source opinions." SSR 96-8p, 1996 WL 374184, at *7. If the ALJ's assessment of RFC conflicts with the opinion of a medical source, the ALJ "must explain why the [medical source] opinion was not adopted." Id. "Medical opinions from treating sources about the nature and severity of an individual's impairment(s) are entitled to special significance and may be entitled to controlling weight. If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the [ALJ] must give it controlling weight." Id.

Ultimate issues such as RFC, "disabled," or "unable to work" are issues reserved to the ALJ. Id. at n.8. Medical source opinions on these ultimate issues must still be considered by the ALJ in making these determinations. Id. However, the ALJ is not required to give such opinions special significance because they were rendered by a treating medical source. Id.

"[W]here there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." SSR 96-8p, 1996 WL 374184, at *3. However, the ALJ

must "make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." Id. at *5.

When writing its opinion, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence . . . .  In assessing RFC, the adjudicator must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." Id. at *7.

Finally, "[T]o find a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Reed, 399 F.3d at 923 (citations omitted, punctuation altered); SSR 96-8p, 1996 WL 374184, at *1 ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule.").

A finding at step two or step three that a claimant has an impairment or limitations does not "magically disappear when the analysis moves to Step Four." Gann v. Colvin, 92 F. Supp. 3d 857, 884 (N.D. Iowa 2015).  However, just because a limitation is found at an earlier step also does not mean there automatically must be a corresponding functional limitation in the RFC formulated at step four.  Id.  Instead, the limitations found at step two or three should be considered when formulating RFC, but they do not "automatically

translate into limitations on the claimant's ability to work."[12]  Id.  See also

Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001) (affirming ALJ's

determination that severe mental impairment did not result in functional

limitations).  The question is whether substantial evidence in the record as a

whole supports the ALJ's RFC formulation.  Pelkey v. Barnhart, 433 F.3d 575,

577 (8th Cir. 2006).

### 2.    The ALJ's Physical RFC

Ms. R. asserts the ALJ found at step two that she had severe

impairments of fibromyalgia and migraines, yet failed to incorporate any

physical limitations into her physical RFC as a result of those conditions or to

explain why no such limitations were warranted.  Ms. R. argues the ALJ

ignored the nature of fibromyalgia and focused instead on traditional objective

findings.

To reiterate, the ALJ found Ms. R. could lift and carry 20 pounds

occasionally and 10 pounds or less frequently; she could sit with normal

breaks for 6 out of 8 hours and stand or walk 3 out of 8 hours; she had no

reaching or manipulation limitations; she could frequently balance, stoop and

crouch; she could never climb ladders, scaffolds, or ropes; she could

occasionally kneel, crawl, and climb ramps or stairs slowly with a handrail; she

had no communication or visual limitations with glasses; she should not be

exposed to unprotected heights or fast or dangerous machinery; pain and

---

[12] Thus, Ms. R.'s assertion that the "RFC must include limitations from all
medically determinable impairments" (Docket No. 31 at p. 8) is an incorrect
statement of the law.

mental impairments limited Ms. R. to understanding, remembering, and carrying out simple, routine, and repetitive tasks of about 2-3 steps on average. T15.

### a.    Fibromyalgia

The ALJ specifically held that Ms. R.'s fibromyalgia, together with the exacerbating condition of her obesity, caused Ms. R. additional problems with lifting, sitting, standing and postural demands.  T17.  The ALJ specifically acknowledged that despite Ms. R.'s good response to conservative treatment she continued to experience "ongoing chronic pain," that recent rheumatoid factors had been documented, and that Ms. R.'s RFC should accordingly be set at a "reduced range of light work activity."  Id.  The ALJ specifically stated it had "considered [her fibromyalgia and obesity] condition[s] and incorporated the appropriate limitations into the residual functional capacity as set forth" in the decision.  Id.  Furthermore, the ALJ acknowledged that Ms. R.'s chronic pain [from fibromyalgia] together with her mental impairments would lead to moderate limitations in her ability to concentrate, persist, and maintain pace. T18, 20.

In support of its RFC, the ALJ noted Ms. R.'s activities of daily living showed her activities were reduced, but were commensurate with a reduced range of light work activity.  T18, 20.  The ALJ noted that during much of the relevant period, Ms. R. had been working part time at the medium exertional level, which was higher than the level assessed in the RFC of reduced range of light activity.  Id.

43

The ALJ also noted that Ms. R.'s work history showed only sporadic work at the level of substantial gainful activity level long before her alleged date of onset of disability, which "erode[d] the probative weight of her allegations." T18.  In other words, Ms. R. had never worked robustly, so her allegations that her disability was responsible for her lack of robust work now was undermined by her work history.  The record cited by the ALJ, Exhibit 17D [T304], showed Ms. R.'s earnings from 1989 through 2018, and revealed that for 15 of the 30 years documented Ms. R.'s annual earnings were less than $6,000 for a whole year.  T304.  Fourteen of those years Ms. R.'s earnings were between $6,000 and $14,999.  Id.  In only one year—the year of 2016—did her earnings reach more than $15,000 ($15,366.01).  Id.

It is clear that the ALJ properly considered Ms. R.'s fibromyalgia under the criteria for evaluating that condition.  The Commissioner notes the three predominant criteria for fibromyalgia are:  (1) a history of widespread pain, (2) at least 11 positive trigger points, and (3) exclusion of other diagnoses.  SSR 12-2p, ¶ II.A., 2012 WL 3104869, at *2-3.  The Commissioner requires "objective medical evidence" to establish the presence of fibromyalgia, and notes that "longitudinal records reflecting ongoing medical evaluation and treatment from acceptable medical sources are especially helpful in establishing the existence and severity" of the disease.  Id. at ¶ III.A.1., 2012 WL 3104869, at *3.  In addition, in considering the limiting effects of fibromyalgia symptoms, the Commissioner directs ALJs to consider "all of the evidence in the case record, including the person's daily activities, medications

or other treatments the person uses, or has used, to alleviate symptoms; [and] the nature and frequency of the person's attempts to obtain medical treatment for symptoms." Id. at ¶ IV.B., 2012 WL 3104769, at *5.  In evaluating all of this, the ALJ is to consider the credibility of the claimant's statements about the limiting effects of his or her fibromyalgia.  Id.  Therefore, if an ALJ is to follow the Commissioner's guidance for evaluating fibromyalgia, it must look to the above factors.

In Ms. R.'s case, the ALJ noted that her medical records documented multiple active trigger points on multiple occasions.  T16-17.  The ALJ noted that Ms. R. underwent trigger point injections and took prescribed medications which helped her, but that she continued to experience chronic pain from her fibromyalgia.  Id.  The ALJ agreed that Ms. R.'s fibromyalgia caused the symptoms she alleged, but did not credit Ms. R.'s statements about the intensity, limiting effects, and persistence of the symptoms because her statements were not consistent with the medical evidence and the other evidence in the record, including Ms. R.'s activities of daily living and her longitudinal work record.  T16.

The court cannot conclude the ALJ erred in evaluating the functional limitations imposed on Ms. R. by her fibromyalgia.  It considered objective medical evidence, but did not use such evidence to determine that Ms. R. did not suffer any symptoms—the ALJ specifically held that Ms. R.'s fibromyalgia continued to cause symptoms despite the largely favorable results of her

treatment.  T17.  Rather, the ALJ relied on Ms. R.'s activities of daily living to conclude her impairment did not affect her RFC as much as she said it did.

For example, Ms. R. lived in a third-floor apartment and took the stairs as there was no elevator.  T47.  She lived alone and was able to manage most of her self-care and home care activities alone.  T47-48, 54-57.  She continued to work part-time at UPS[13] for almost two years following her date of onset of disability in which job she was required to lift 50 pounds together with another person.  Id.  She had good and bad nights of sleep, but her muscle relaxer that was prescribed allowed her to fall right back asleep.  T57.

Ms. R. often elided answering questions from her own attorney such as when she was asked if she socialized, had hobbies, or how far she could walk. T57-58.  Ms. R.'s responses did not directly answer these questions.  Id.  She testified she could only sit for 15 minutes and stand for 15 minutes at a time. T58.  Ms. R. testified she could lift and carry 10 pounds daily, which is exactly the RFC the ALJ determined for her.  T15, 58.  In addition to her medications, Ms. R. testified she addressed her fibromyalgia symptoms by using hot and cold packs, taking Epsom salts baths and sometimes using a TENS unit. T51-52.

The cases cited by Ms. R. in support of her argument are distinguishable from the record in her case.  In those cases, the ALJ used objective medical evidence to conclude that a claimant's fibromyalgia was either nonexistent, not severe, or did not produce any symptoms or functional limitations.  See, e.g.,

---

[13] United Parcel Service.

Garza v. Barnhart, 397 F.3d 1087, 1089 (8th Cir. 2005) (ALJ rejected alleged symptoms because there was no objective medical evidence substantiating); Arakas v. Comm'r, 983 F.3d 83, 95-96 (4th Cir. 2020) (ALJ discredited all claimant's allegations of symptoms because not supported by clinical and laboratory abnormalities).  Here, the ALJ followed the guidance provided by the Commissioner in SSR 12-2p by considering all the longitudinal evidence, which includes objective medical evidence as well as Ms. R.'s daily activities.  The ALJ agreed that Ms. R.'s fibromyalgia produced some symptoms, despite treatment, and incorporated significant limitations into her RFC on account of those symptoms.

The court concludes the ALJ properly evaluated the effect Ms. R.'s fibromyalgia had on her RFC and that the limitations from her fibromyalgia incorporated into her RFC are supported by substantial evidence in the record. The court affirms this part of the ALJ's decision.

### b.    Migraines

Ms. R. asserts that the ALJ found her migraines to be severe but did not include any limitations in the RFC or the hypothetical to the VE about "the frequency of headaches, required breaks, absences, difficulties concentrating or staying on task, or any other limitation related to her headaches."  Docket No. 31 at pp. 17-18.  The court disagrees with this assertion.

The limitations the ALJ incorporated into Ms. R.'s RFC that can be linked to her migraines are that she should not be exposed to unprotected heights or fast or dangerous machinery and that pain and mental impairments limited

47

Ms. R. to understanding, remembering, and carrying out simple, routine, and repetitive tasks of about 2-3 steps on average.  T15.  This correlates with Ms. R.'s medical records from 2017 – 2018 in which her complaints mainly focused on physical pain with some complaints of difficulties concentrating and focusing due to that pain.  T18 (citing Exh. 25F pp. 9-15 (T849-55)).

Ms. R. asserts in her brief that she testified she suffered from seven migraines per month.  Docket No. 31 at p. 16.  This is not accurate.  Ms. R. testified that at the time of the ALJ hearing she was experiencing about three migraines per month.  T52.  She testified that these migraines sometimes lasted a day and a half.  Id.  She credited the reduction in her migraines to the medication regime her doctors had instituted which included monthly injections and an oral medication.  Id.

Ms. R.'s testimony before the ALJ is corroborated by medical evidence which showed Ms. R. informed her doctors in April 2018 that Sumatriptan rendered her headaches tolerable and reduced them to once per week and in August 2018 she said that Imitrex worked well to abort her headaches before they became migraines.  T17 (citing Exh. 29F at pp. 23, 33 (T941, 951)).  In December 2018 she reported improvement in headaches with these medications and indicated she had no desire to change the medications.  T17 (citing Exh. 35F, p. 3 (T10181)).  Ms. R. did not testify at the hearing that her migraines caused her to take breaks or that she would be absent from work because of them.  T52.

In her function report written in 2017, Ms. R. stated she was able to pay bills, count change, handle a savings account and use a checkbook. T356. She stated her hobbies included doing puzzles. T357. She did not describe having to take breaks due to her migraines, miss activities or miss work (she was still working at UPS during the time the function report was filled out). T353-63. Nowhere did Ms. R. describe limitations such as are suggested by counsel in his brief. Although Kimberly Lunder, P.A.-C stated in a November 2016 *physical* RFC questionnaire that Ms. R. would likely miss 4 days of work per month (T438), the ALJ rejected this opinion as unsupported by the rest of the documentation in the record. T19.

The ALJ specifically limited Ms. R.'s ability to focus mentally on her work based on the pain from her migraines and her mental impairments. T15, 18. That limitation was to understanding, remembering, and carrying out simple, routine and repetitive tasks of about 2-3 steps on average. T15. This is commensurate with Ms. R.'s own description of the limitations imposed by her migraines. It also is congruent with Ms. R.'s medical records, especially those in 2018. The court concludes the ALJ's physical RFC related to Ms. R.'s migraines is supported by substantial evidence.

Ms. R. accuses the ALJ of overlooking evidence that Ms. R.'s headaches had worsened in December 2018. Docket No. 31 at pp. 16-17. The court finds the ALJ's characterization of the medical evidence was a fair representation of that evidence.

49

In the record in question, Ms. R. did tell her doctor she had been experiencing increased frequency of headaches up to two per week, but her Imitrex was working well to control those headaches. T1018-19. The doctor offered to perform occipital nerve blocks or change up Ms. R.'s medication regiment, but she demurred, stating she wanted to continue her current medications. Id. The doctor did tell Ms. R. not to use Imitrex more than twice per week, but at that time that is exactly how frequently Ms. R. needed to use Imitrex, so she was not left with migraines for which she lacked treatment options. Id. The court concludes the ALJ fairly characterized the December 2018 treatment note. T17.

This is not a case like the Perrin case cited by Ms. R. where the ALJ failed to mention headaches at all when formulating the claimant's RFC. Perrin v. Berryhill, 4:16-cv-04178-LLP, 2017 WL 7050670, at *22 (D.S.D. Nov. 27, 2017). Nor is it a case like Reza where the ALJ failed to mention how the claimant's functional capacity was affected by the claimant's headaches. Reza v. Saul, 4:19-cv-04124-VLD, 2020 WL 1866477, at *15 (D.S.D. Apr. 14, 2020). Here, the ALJ discussed Ms. R.'s headaches, acknowledged that she continued to experience pain from them even though she responded well to treatments, and incorporated functional limitations into the RFC because of them (difficulty concentrating, remembering, persisting). The court concludes that the ALJ's physical RFC as regards Ms. R.'s migraines was supported by substantial evidence in the record.

### 3.    The ALJ's Mental RFC

Ms. R. points out that the ALJ rejected the state agency consultants' opinions as to Ms. R.'s mental RFC.  The only other evidence in the record concerning Ms. R.'s mental RFC was a questionnaire filled out by Kimberly Lunder, P.A.-C in November 2016.  T433-35.  Although the ALJ wrote that it gave "great weight" to this opinion, the ALJ also materially mischaracterized Lunder's opinion, thus requiring reversal according to Ms. R.  The Commissioner acknowledges that the ALJ made a mistake when describing Lunder's opinion, but states the error was harmless and should not require reversal.

Lunder wrote in her mental impairment questionnaire that Ms. R. suffered from depression and anxiety due to her fibromyalgia.  T433.  Lunder opined that Ms. R. experienced *no* impairment of her understanding and memory.  Id.  Lunder opined that Ms. R. had *no* impairment of her ability to carry out very short and simple instructions, to carry out detailed instructions, or to sustain an ordinary routine without special supervision.  Id.  Lunder opined Ms. R. had a slight impairment of her ability to maintain attention and concentration for extended periods.  Id.  Lunder opined Ms. R. had a moderate impairment of her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.  Id.

In the category of sustained concentration and persistence, Lunder wrote that Ms. R. had *no* limitations except in her ability to perform at a consistent pace with a standard number and length of rest periods.  T434.  In this,

51

Lunder opined Ms. R. was moderately impaired.  Id.  Lunder hand wrote that Ms. R. "[a]t times may be slower to complete tasks or require more rest periods due to pain/mental fatigue due to diagnosis."  Id.  Lunder opined Ms. R. had no impairments in the category of social interaction.  Id.  She also opined Ms. R. had no impairments in the category of adaptation.  T435.

The ALJ wrote the following about PA Lunder's mental impairment opinions:

> The undersigned has considered the statements of Kimberly Lunder, P.A.-C. . . .  Ms. Lunder is not an acceptable medical source but does have a treating relationship with the claimant in her professional capacity.  In November of 2016, Ms. Lunder completed a mental impairment form indicating marked limitations in sustaining concentration with no other significant limitations noted. . . .  The undersigned accepts those statements and affords the[m] great weight, as they are generally consistent with the longitudinal record documenting chronic pain complaints with some abnormal findings in her mental status examinations.

T19.

Both parties agree the ALJ erred by stating Lunder found "marked" limitations in sustaining concentration.  Id.  Lunder actually found "slight" limitations in Ms. R.'s ability to maintain attention and concentration for extended periods of time.  T433.  Because a "slight" impairment is less than a "marked" impairment, the Commissioner argues the ALJ's error was actually in Ms. R.'s favor and is, therefore, harmless.

But Ms. R. argues the ALJ's error was two-fold.  Not only did the ALJ get the degree of limitation as to maintaining attention and concentration wrong, but the ALJ also erred when it said Lunder found no other impairments.  Lunder *did* find impairments in two other categories.  She found a "moderate"

impairment in Ms. R.'s ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.  T433. Lunder also opined Ms. R. was moderately impaired in her ability to perform at a consistent pace with a standard number and length of rest periods.  T434. These errors or omissions by the ALJ were *not* in Ms. R.'s favor.  Nor can they be characterized as harmless.

As discussed above in the context of the physical RFC, the only evidence in the record that Ms. R. would have greater than a normal number of absences from work or would need more breaks than normally allowed came from Lunder's physical RFC opinion—Ms. R. herself did not testify about this. T438.  In the context of Ms. R.'s physical RFC, the ALJ *rejected* this opinion by Lunder about absenteeism.  T19.  But the ALJ gave great weight to Lunder's mental impairment opinion (T19), which contained the same or similar opinion as to absenteeism due to Ms. R.'s impairments.  Compare T438 (claimant could be expected to miss work more than four times per month) with T433 (moderately impaired in maintaining regular attendance).  On this record, the court cannot reconcile these two contradictory stances by the ALJ, especially when the hypothetical to the VE (based on the RFC found by the ALJ) contained no limitations related to absenteeism.  The court would have to speculate about what the ALJ meant to say or hold.  This the court is not allowed to do.

Similarly, when the ALJ stated Lunder opined there were no other limitations (T19), this overlooked Lunder's opinion that Ms. R. was moderately

limited in her ability to perform at a consistent pace with a standard number and length of rest periods.  T434.  Lunder emphasized this opinion as to Ms. R.'s limitation by hand-writing on the form that Ms. R. might be slower to complete tasks and require more frequent rest breaks.  Id.  Again, the ALJ's RFC and its hypothetical to the VE do not include any limitation related to slow working or more frequent rest breaks.  The court cannot reconcile the ALJ's opinion with Lunder's opinion.  Because the ALJ opinion is materially at odds with Lunder's opinion and the ALJ does not acknowledge this or discuss it but purports to instead give great weight to Lunder's opinion, the court is left with speculation as the only means to reconcile the differences.  The court cannot do this.  Remand is required for the ALJ to reconsider and explain its mental RFC formulation and how that RFC relates to the medical and other evidence in the record.

**G.    The ALJ's Step Five Determination**

Ms. R. alleges the ALJ erred at step five in determining the number of jobs available in the national economy.  The VE testified Ms. R. could do the jobs of electronics worker (DOT code 726.687-010), inspector and hand packager (DOT code 559.687-074), and assembler, small products I (DOT code 706.684-022).  T69-70.  The VE testified there were 15,000; 31,000; and 20,000 of each of these jobs, respectively, available "nationally."  Id.

Section 423(d)(2)(A) of Title 42 provides as follows:

(A) An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. *For purposes of the preceding sentence* (with respect to any individual), *"work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.*

See 42 U.S.C. § 423(d)(2)(A) (emphasis added).  See also 20 C.F.R.

§ 404.1566(a) ("We consider that work exists in the national economy when it

exists in significant numbers either in the region where you live or in several

other regions of the country.").

The Commissioner's rulings state "[w]henever vocational resources are

used and the decision is adverse to the claimant, the determination or decision

will include: . . . a statement of the incidence of such work in the region in

which the individual resides or in several regions of the country."  See SSR

85-15, 1985 WL 56857, at *3 (Jan. 1, 1985).  The purpose of these provisions

is so that claimants are not denied benefits on the basis of "[i]solated jobs that

exist only in very limited numbers in relatively few locations outside of the

region where [they] live."  20 C.F.R. § 404.1566(b).  This court, in Porter v.

Berryhill, 5:17-CV-05028-VLD, 2018 WL 2138661 (D.S.D. May 9, 2018), found

that "at step five, the ALJ must find that jobs the claimant can do exist in

substantial numbers in the claimant's own 'region' (something less than the

whole nation), or in 'several regions' (several parts that, together, consist of

something less than the whole nation)."  Id. at *63.  (ordering remand because

VE testified only about jobs available "nationally" and ALJ only considered jobs

available nationally at step five).

Although neither the Eighth Circuit nor the Commissioner has endeavored to determine what the term "region" means, the Ninth Circuit addressed that issue in <u>Gutierrez v. Comm'r of Soc. Sec.</u>, 740 F.3d 519 (9th Cir. 2014).  In that case, the VE testified at the ALJ hearing about the numbers of jobs available in the claimant's state of California and the numbers of such jobs available nationally.  <u>Id.</u> at 521.  The claimant argued that the ALJ erred in determining the state of California could constitute a "region" within the meaning of the definition of "national economy."  <u>Id.</u> at 522.  The court concluded the term "region" was flexible and that an ALJ does not necessarily err when it uses the claimant's state of residence as a proxy for "region."  <u>Id.</u> at 526-27.  Interestingly, the Ninth Circuit cited the Eighth Circuit opinion in <u>Jones v. Chater</u>, 72 F.3d 81, 82 (8th Cir. 1995), for that proposition.  <u>Id.</u> at 527 (citing <u>Jones</u> for the proposition that using the claimant's state of Iowa as a proxy for "region" was appropriate).  Whatever the precise definition of "region" is, it does *not* mean "nationally," nor does it mean the claimant's immediate area.  <u>Id.</u> at 526-27.

Here, the VE testified only to the number of jobs available "nationally." T69-70.  The ALJ considered only the number of jobs available nationally at step five.  T22.  "[Section] 423(d)(2)(A) and § 404.1566 require more specificity than that."  <u>Porter</u>, 2018 WL 2138661, at *64.  The burden to find these qualifying jobs is on the Commissioner at step five of the sequential analysis. <u>Smith v. Shalala</u>, 46 F.3d 45, 47 (8th Cir. 1995).  The law clearly requires the Commissioner to present evidence that jobs Ms. R. can perform exist in the

56

national economy by showing that a significant number of those jobs exist in Ms. R.'s region or in several other regions of the country.

Therefore, the absence of valid evidence of substantial numbers of jobs in Ms. R.'s region or several other regions is an absence of evidence that cuts against the Commissioner.  This court will not hazard guesses about facts that might have been adduced at the agency level, namely whether the jobs the VE identified exist in substantial numbers in the region where Ms. R. lives or in several other regions of the country.  The Commissioner's failure of proof requires remand to the agency to further develop these facts at step five.

The Commissioner cites a number of cases in support of its argument that "in the national economy" means "nationally," despite the statutory evidence and internal SSR guidance to the contrary.  The cases cited do not so hold.  In <u>Raymond v. Astrue</u>, 621 F.3d 1269, 1272-74 (10th Cir. 2009), the VE testified to the number of jobs available nationally and in the claimant's state of New Mexico; the issue before the Tenth Circuit was whether the actual number recited in evidence was a "significant" number of jobs.  Similarly, in <u>Allen v. Bowen</u>, 816 F.2d 600, 602-03 (11th Cir. 1987), the VE testified to the number of appliance repair jobs available in the claimant's area, state and in the nation and the question presented to the Eleventh Circuit was merely whether this number of jobs was "significant."

In <u>Dressel v. Califano</u>, 558 F.2d 504, 506 (8th Cir. 1977), the opinion does not reveal *what* the VE's actual testimony nor the ALJ's actual decision was regarding the number of jobs available and where those jobs were located.

57

The issue before the court was the relevance of claimant's evidence that local businesses would not hire handicapped persons, but even that part of the court's opinion was *dicta*.  Id. at 508-09 (stating "we find it unnecessary to consider appellant's argument that the Secretary failed to show local hiring practices in regard to handicapped individuals such as claimant, or to give sufficient evidence on the availability of jobs claimant can allegedly perform.").

In Miller v. Finch, 430 F.2d 321, 324 (8th Cir. 1970), the court merely held that "work which exists in the national economy" means "work which exists in significant numbers either in the region where such individual lives or in several regions of the country," and that this standard did not require the Commissioner to prove there was work existing in the immediate area where the claimant lives.  See also Wood v. Comm'r of Soc. Sec., No. 19-1560, 2020 WL 618536 *6 (6th Cir. Jan. 31, 2020); (defining "national economy" as "work which exists in significant numbers either in the region where such individual lives or in several regions of the country."); Taskila v. Comm'r of Soc. Sec., 819 F.3d 902, 903-04 (6th Cir. 2016) (same); Gutierrez, 740 F.3d at 524 (same); Lirley v. Barnhart, 124 F. App'x 283, 283-84 (5th Cir. 2005) (same).  The court agrees wholeheartedly with this statement.  But that does not support the Commissioner's position herein.

Other cases cited by the Commissioner simply use the term of art "national economy" without explaining what that term of art means because the meaning of that term was not at issue in the case.  Purdy v. Berryhill, 887 F.3d 7, 14-15 (1st Cir. 2018) (resolving claimant's objection to the VE's use of

software Job Browser Pro to come up with numbers of available jobs);

<u>Sanchez v. Comm'r Soc. Sec.</u>, 705 F. App'x 95, 98-99 (3d Cir. 2017) (arguing

that claimant did not have the RFC to perform the jobs identified by the VE).

It is true that in the unpublished, two-paragraph *per curiam* opinion by

the Fifth Circuit in <u>Lirley</u> the court held that the VE's testimony that 50,000

jobs existed in the national economy constituted substantial evidence that a

significant number of those jobs existed in claimant's region or in other regions

of the country.  <u>Lirley</u>, 124 F. App'x at 283-84.  <u>Lirley</u> is not binding precedent

on this court nor even in the Fifth Circuit where it was issued.  Furthermore,

while an opinion about the numbers of expected jobs in the densely-populated

highly-diverse and varied job market of Dallas, Texas, where the <u>Lirley</u> decision

originated, is far different from assuming those same jobs are available in

significant numbers in the very lightly-populated job-sparse markets in North

and South Dakota, Nebraska, Iowa, Wyoming, Montana or anywhere but

Minneapolis-St. Paul in Minnesota.  This court is not willing to take a factual

leap of faith about the availability of jobs in fly-over country where the law

clearly requires the Commissioner to establish a more discrete set of facts to

satisfy its own burden at step five.

The Sixth Circuit's unpublished opinion in <u>Wood</u>, *supra*, is the same.

Although the court held in a non-binding opinion that the VE's testimony of the

number of jobs available "in the country" was sufficient to carry the

Commissioner's burden at step five, the number of jobs in question in that case

was nearly *half a million jobs*.  <u>Wood</u>, 2020 WL 618536, at *6.  Making an

assumption that *if* there are half a million jobs of a certain type nationally, *then* there are also a "significant" number of those jobs available in the claimant's highly industrial "region" does not require much of a leap of faith.

In Ms. R.'s case the Commissioner did not meet its burden, and remand is warranted for clarification of the issue at step five.  It is not for this court to guess about how many of the 66,000 jobs identified by the VE as being available nationally in this case are actually available in Ms. R.'s "region" or in "several regions of the country."  Remand is required so that the ALJ may return to step five to develop the facts as to whether work Ms. R. can perform exists in significant numbers in the "national economy" *as that term is defined by law*.

The Commissioner also argues Ms. R. forfeited her right to challenge the Commissioner's step-five finding because she did not question the VE at the hearing as to this issue.  The Commissioner cites Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003), for the proposition that a claimant forfeits an issue not raised in the administrative proceedings.  But Anderson dealt with the claimant's failure to allege obesity as a severe impairment or as limiting his function in any way.  Id.  As Ms. R. notes in her reply brief, it may be appropriate to apply forfeiture to steps one through four where the claimant herself bears the burden of proof.

But here, the alleged legal error is at step five.  At step five, unlike at step two, the burden was on the Commissioner to present valid evidence of the existence of work existing in substantial numbers in Ms. R.'s region or several

regions of the country that Ms. R. could perform.  The court will not impose forfeiture on Ms. R. because her hearing counsel failed to help the Commissioner meet its burden.  Therefore, <u>Anderson</u> does not support the finding that Ms. R. forfeited her claim not challenging the VE's qualifications or asking what the VE meant by "in the national economy."

The Commissioner also cites <u>Shaibi v. Berryhill</u>, 883 F.3d 1102, 1109-10 (9th Cir. 2017), in support of its forfeiture argument.  In <u>Shaibi</u>, the VE properly (according to the above discussion) testified to numbers of jobs available in the claimant's region and nationally.  <u>Id.</u> at 1104.  At the ALJ hearing, the claimant did not question the VE about the job numbers, but on appeal to the district court the claimant argued the numbers of jobs the VE testified to were inaccurate.  <u>Id.</u> at 1108.  This was a *factual* challenge—Shaibi argued that the VE's job estimates did not correspond accurately to listed sources of administrative job notices.  <u>Id.</u>  The court did hold that failure to raise this factual challenge to the VE's numbers at the administrative level resulted in forfeiting the right to raise the argument before the district court. <u>Id.</u> at 1109.

<u>Shaibi</u> is distinguishable.  It makes all kinds of sense that factual arguments about the numbers of jobs themselves must be raised at the administrative level if a claimant wants to preserve that argument before the district court.  However, the same is not true of legal errors.  The ALJ is charged with applying the correct law, and errors of law must be overturned on appeal.  <u>Walker</u>, 141 F.3d at 853; <u>Smith</u>, 982 F.2d at 311; 42 U.S.C. § 405(g).

An ALJ's erroneous interpretation of the law is not binding on the district court.  Smith, 982 F.2d at 311.  Here, the court concludes the ALJ made a legal error in equating "national economy" with "nationally" despite contrary definitions provided in statute and by the Commissioner himself in SSR guidance.

## H.    Type of Remand

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record. Ms. R. requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider her case.

Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by the Commissioner of the Social Security Administration.  It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands.  A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling.  Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000).  A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering

62

the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings.  Id. Neither sentence six situation applies here.

A sentence four remand is applicable in this case.  Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding." Buckner, 213 F.3d at 1011.  In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings.  Id.; Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated.  See also Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability).  Therefore, a remand for further administrative proceedings is appropriate.

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, it is hereby ORDERED that the Commissioner's decision is REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four. Ms. R.'s motion to remand [Docket No. 30] is GRANTED in part and denied in part and the Commissioner's motion to affirm [Docket No. 32] is DENIED in part and granted in part.  On remand, the Commissioner is directed to

reconsider migraines at step three, mental RFC at step four, and how many jobs are available to Ms. R. in her region or in several regions of the country at step five.

    DATED July 21, 2021.

                                        BY THE COURT:

                                        _____
                                        VERONICA L. DUFFY
                                        United States Magistrate Judge